May it please the Court, Paul Hederman on behalf of the Plaintiffs' Appellants. We would like to split our time 10 and 10 with right of encroachment. Say that again, what was the last part? With right of encroachment. If I extend over to 10, yes. The appeal here consists of three different claims. One has been brought by the Plaintiff International Ironworkers Association against the Defendant International Longshoremen Association for breach of contract arising out of a breach of the AFL-CIO Constitution. We could not bring an action against the longshoremen under the Constitution because they left, and that's why we pursued on a breach of contract. The plaintiff contractors have pursued claims against the defendants for violations of AD and 8B-4 of the NLRA and Section 303 of the Labor Management Relations Act for entering into a cease-doing business provision, as well as antitrust claims under Sections 1 and 2 of the Sherman Antitrust Act. You've got a lot of ground potentially to cover. What are you going to focus on in your limited time? That's fine, Your Honor. With respect to the breach of contract claim, I think we've addressed that in our brief. If the Court has any questions about that, we'd be happy to address it. Let me ask on the breach of contract claim, if you were given the opportunity to amend, what additional allegations would you make that would fix that claim? Your Honor, it's a little unclear what the defendant's complaint is. As we've indicated, the work involved here involves these huge ship-to-shore cranes. So everyone knows where the work is being done. Now, it's possible that instead of just identifying ports, we could identify particular terminals within the ports. I can't imagine that they would need any additional information other than that. But all of that information, quite frankly, has been disclosed during discovery. So if the defendants say, well, we need this particular thing, we could provide that to them. It's just that at this point, it's unclear exactly what they're asking for. But given the nature of the work involved, there's no question about where this work is being performed. Well, the Constitution talks about the work taking place at a specific place. So why wouldn't you just allege that instead of say, if that's what the defense wants, if that's what the Court wants, that we would do that? Why not just make specific allegations as to where the work is occurring? Quite frankly, we would have had the Court have said, look, you can't just identify ports. You've got to give them particular terminals or something like that. We would have done it. But what happened is that the last one, the Court simply said, the defendant argued, well, given us the ports isn't enough, and the Court said, I agree, it's not enough, and you're dismissed with prejudice. So we never had the opportunity to do that. And so that's what we would have done if given that opportunity. Can I ask, just before you move off of that, what's the remedy that you're seeking on that claim? That would be damages, Your Honor. As I understand it, that was not a remedy permitted under the Constitution, right? It's not permitted under the Constitution, but since we can no longer enforce the Constitution, we have to resort to federal common law. But, like, if you entered into a contract, let's just put aside the Constitution, you and I entered into a contract, and we say that if either of us breaches it, here are the remedies we can seek, and they don't include damages. Right. I don't think if I breach it, you can't sue me in court and then say, hey, I want to collect damages. No, that's correct. Or you're limited to what's in the contract. That's correct, Your Honor. As long as the remedies available under the contract were still feasible. And so the problem, as we have now, is that under the Constitution, as long as the longshoremen were a member of the AFL-CIO, we had legitimate remedies against them. Since they left the AFL-CIO, we don't. But why does that entail you to damage? I guess I don't understand how that translates into damages. That would be a question under the federal common law. And, quite frankly, Your Honor, that issue was not addressed in the district court. Well, I know, but that's been raised as an alternative claim to the problems. It has, but it was not addressed in the district court, so the district court didn't address it, and we didn't respond to it. Right, but you have now, and it's before us. Right. And, as I said, I'm kind of struggling, but, yeah, why doesn't that preclude you? Whatever remedy, if you're now just seeking damages, it seems to me that's not available to you. Well, Your Honor, our position is, since we can no longer proceed under the Constitution within the AFL-CIO framework, then we're free to pursue the claim for damages. Okay, you've got a lot of other ground to cover. Thank you. Your Honor, with respect to the labor law claim, we have alleged a violation of AD and AB 4, which would entitle us to a claim under damages. The defendants haven't really challenged the fact that it's a violation of AD and AB 4, but they say that, for some reason, we have to deny the affirmative defense of work preservation. They get into a discussion of primary versus secondary. The primary is work preservation. They say you haven't alleged a secondary purpose, but we clearly have. We've alleged that the purpose of this was not for work preservation, but was clearly for purposes of work acquisition. So even if we were required to allege it, we have, but the simple fact is we don't have to. Primary purpose is an affirmative defense. AD specifically provides for exceptions for the construction industry and the garment industry. The courts have imposed an exception for work preservation, but those are all exceptions. It's quite clear under the law that construction industry and garment industry are affirmative defenses. There's no reason to treat primary purpose differently. In fact, the cases we've cited indicated that it is an affirmative defense. The defendants don't address it. Remind me, the case you cited, you only cited one case, if I remember, and I looked at it and it did not seem to be on point for the proposition you cited. So tell me again what's the best authority you've got for the proposition that it's an affirmative defense? On work preservation, it's the BOCA case that we cited, which is NLRB BOCA. That's an acronym B-O-C-A, and that's a case some time ago that talked about why work preservation would be considered. Right, that's a board decision, right? Yes. Yeah, I'm talking about circuit authority. Well, the most recent case would be the Connecticut Ironworkers case, which recently came out, and there the court said that the construction industry proviso is an affirmative defense. Yes. Okay. Okay. Nothing from our circuit, I gather? Nothing from the Supreme Court? No, no. Yeah, yeah. Okay. But again, they've not cited anything, but the idea was even if it is an affirmative, even if it's part of our claim, we've said that it's not a primary purpose, it's not work preservation, but it's work acquisition. So we've alleged that. Well, yeah, but you can't just say that and then that's it. You've got to have support in factual context. And we did. We've alleged that they never did the work before, that it was only after the PCLCD in 2008 was enacted, which effectively gave them a monopoly over the work, that they began to perform it. And we've alleged that their employees or their members never performed this work before, and that's the standard for work preservation. Have your members performed the work before? And we specifically say they never did. I grant you that. Yes, but why isn't it still within the realm of work preservation if it's definitely true? You're not disputing that. They are trying to address the loss of jobs in the sector that they traditionally are. No, I disagree with that, Your Honor. Okay. Why do you disagree with that? They're just trying to grab work. They're not trying to preserve work. They're trying to go grab work. And this isn't a situation where they've lost work to technology, and they're trying to say, okay, if you've come out with a machine that does this work that our members used to do, then we want to make sure that we get to operate the machines. That would be work preservation. Here they've simply said, we lost work doing work A, and so now we're going to go out and try to grab work B. That's all it is. And it's clear that that is not permitted under either labor law or the trust laws. Now, they can say, well, we said in our PCLCD that we're trying to do all this. Well, first of all, none of that is admissible with respect to the motion to dismiss or even with respect to the motion for summary judgment. But the simple fact is that they have to be able to demonstrate that they're specifically trying to replace certain work that their employees or members actually performed. And they can't do it. I mean, even the district court below said there was no evidence to support the finding of the work preservation or their claim of work preservation. And we don't have any here. Their workers, members simply never did the work before. And they can't broaden this to say, we want to get work B because we lost work A. That's clearly not what the Supreme Court has said. Okay, well, why is that the case? Because you're only entitled to go after or preserve work that your members have performed and you're now losing. The typical example is that the employer says, look, it's too expensive for me to let you guys do the work, so I'm going to ship it out to a non-union contractor. And the courts say, that is a question of work preservation. That's a mandatory subject of collective bargaining under those circumstances. You have to negotiate over that. But that's what they're trying to do. That's what you're talking about in the traditional case of work preservation. But it's not the case where the union says, look, we've lost work A to technology, so now we're going to go out and try to steal somebody else's work, work C. And if I might, just to be clear about this, we're not claiming we have the exclusive right to perform the work. What we're saying is that we have the right to compete for the work. And their contracts, which say, nope, you can't do work with non-ILW contractors, violates both the labor law and the antitrust laws because they're eliminating the possibility of competition. That's what they're doing is they say, look, we've never done this work before. We don't know how to do it. If we go out and compete, we're never going to get a job. So what we'll do is they'll write up a contract that says, you've got to give the work to us. That way we'll get it. And that also applies to the antitrust. The antitrust consists of a horizontal and vertical agreements by which the defendants have basically attempted to monopolize the work, and they've eliminated non-ILW contractors. Can I ask you about, there's a reference in there about the PMA maintenance companies are the competitors of the contractor plaintiffs. Could you explain to me how they compete against the contractor plaintiffs? Because they do the same work. And what is that work? That would be the specialized rigging that we've identified as the relevant work. Is that alleged in the Third Amendment complaint? Yes, Your Honor. Where at? We've identified it in the brief as the fact that they did it. PMA acknowledged that they did it, that the ILW contractors did the work. Because what happened is that after the contract was entered and enforced, the work had to go to the ILW contractors. Well, they didn't have anybody, so they started just saying, okay, I'll do it, I'll do it. As long as you're signatory to the ILW, you can do it. So one of their arguments is that, hey, look, there's no adverse effect on competition here because ILW members have stepped in to do it. So those are the contractors that are doing the work. Obviously, they would have been competitors of the plaintiff contractors before 2008 if they were able to do the work. But the reason that they weren't active competitors is because they weren't qualified. They wouldn't get any work. But once they got the monopoly, then they're guaranteed to work. But as we discussed in our brief, that's intra-brand competition, just one ILW contractor versus another. They've eliminated anybody else, all non-ILW contractors. And that's the problem, is that they've eliminated intra-brand competition. And that's clearly a violation of the antitrust laws. Did you want to let your co-counsel argue? Oh, I'm going to do it all. Okay. You said 10 and 10. Yes. So at this point, unless you have some specific questions, I'd be happy to address. Then I'll reserve my balance of my time. Thank you. May I please the court? Thomas Peterson for Pacific Maritime Association. I'm going to take up to a maximum of eight minutes, and then I'll yield the balance to Eleanor Morton, who's here on behalf of the union. And so I'm going to focus, obviously, on the antitrust claims, which are the only ones that implicate PMA. And so exactly four months before the district court dismissed this case, the plaintiffs told the district judge, in opposing PMA's joinder, quote, PMA has not engaged in anti-competitive conduct. I'm nevertheless here asking you to uphold the judgment on the antitrust claims that was entered in favor of PMA, and there's a whole series of reasons why you can do that. But before I get to that, I'd like to start with Judge Zipp's question about these maintenance companies. In the brief, there's all sorts of statements made about maintenance companies and that they somehow had a role in this. But if you actually look at the third amended complaint, the totality of the mention of maintenance companies is in paragraph 19, which is in the excerpts at page 64. And all it says is that PMA is a multi-employer association whose members include Stevedore Companies, Marine Terminal Operator Carriers, and maintenance companies. There's no allegation anywhere in the complaint that the maintenance companies would in any way benefit from any of the provisions in this case with respect to this provision of the collected bargaining agreement. And I'll get back in a minute to the flaws in this case from a section 1 and section 2 point of view. But I'd like to start with what I think is the clearest path for this court to uphold in the light of its own recent precedent in the ITCSI case, and that's the non-statutory labor exemption. As the court knows, the ITCSI case involved the very same collective bargaining agreement that we're talking about here, and it involved a very similar type of claim, which was that the Longshore Workers Union, negotiating with PMA, had secured rights to, in that case, reefer work, which arguably had been done before by a different union. But that, at least in part, had been done by the ILWU, right? That's the main ground on which your opponents try to distinguish X.D., is to say that, well, in that case, though, the union had done some of that work before, whereas here it had done zero. They do try to make that distinction, but I don't think it's a legitimate or, let me put it this way, it's not a material distinction for purposes of applying the Mackey factors and the non-statutory exemption. And the reason is that this court's precedent, not only in ITCSI, but also in Judge Kennedy's opinion in the Richards case, makes clear that, let's assume, I'm sure Ms. Morton is going to want to talk about how there's no credible 8E violation claim here. But even if we assume there was, that is, even if we were to assume that this work had not previously belonged to this union, it's immaterial to the application of the exemption. In other words, even if there's a violation of 8E, it does not preclude the application of the exemption. That's what the court held both in the Richards case and reiterated in the ITCSI case. If you look at the Mackey factors, the third one was this agreement, the product of arm's-length bargaining. It's the same contract, and all you have to do is look at Mr. Sundet's declaration, which was filed by the union, which points out all the negotiations back and forth because of this technological change that they were trying to address, this bargaining trade-off. Second, if you look at the second Mackey factor, that is whether this is a traditional subject of collective bargaining. Work assignment, as ITCSI tells us, is a classic example of that. Well, they say this isn't work assignment, though, right? Well, Your Honor, one of the things, well, they say that, but this court's... Why aren't they right, though? I beg your pardon? Why aren't they right about that? They're not right because a traditional subject of any collective bargaining agreement is what is the work that will be done by the bargaining unit. That's what ITCSI says, and that's what even the plaintiff says in the reply brief, page 54. It is true that an employer may be required to bargain over whether to subcontract work if the union has a valid claim to pressing that work. Now, again, whether there's a valid claim or not in the 8E sense is not relevant to the application of the exemption based on this circuit's precedent, but it's clear that one of the things that you'd bargain about in the collective bargaining setting is what is the work that's going to be covered by the unit. Now, and then the third factor, the third Mackey factor, is whether the restraint primarily affects the parties to the agreement. Well, this court has made clear in Richards and reiterated again in ITCSI that the mere fact that an agreement over a subject of collective bargaining has an impact on others does not preclude the trigger of that element of the Mackey test, and it makes a lot of sense because it's kind of a zero-sum game after all. If there's an agreement, a collectively bargained agreement, that certain work is going to be assigned to a particular union, well, it means the work's not available for someone else to do, and this court has sort of made that observation in other contexts as well. The Phoenix case, Judge Schroeder sitting in the other room, that case also makes the point that the exemption applies in circumstances where the effect of the agreement is to take work away, even though that has some sort of what I'll call a residual effect on those who are not able to do it in that context. Let me ask you, as far as the ITCSI case and the first Mackey factor, whether or not it primarily affects parties to the collective bargaining agreement, I mean, there ITCSI was affected. It was a PMA company, correct? Yes. Whereas here the agreement is affecting not a signatory to that agreement and not the contractor that the PMA company might hire, but yet another level. So isn't it factually different than the ITCSI case? It's not. It's not first because if you look factually at the ITCSI case, insofar as one wants to talk about the impact on subcontractors who are not PMA members, that was part of the factual scenario in ITCSI itself. If you look particularly at the district court opinion at page 1087, the court describes the fact that the allegations included that non-PMA members were being adversely affected by this arrangement and their subcontracting rights were being adversely affected. But let me just go back apart from the fact that factually the cases really do overlap. I think you just have to go back again to the basic test which is laid out for the non-statutory exemption. There can be residual effects which can impact others, but so long as it is part of a collective bargaining agreement as to a legitimate subject of collective bargaining, then that puts it within the exemption. And, you know, for example, this court in its dump truck case made very clear that the way you distinguish cases like Connell is that the agreements that ran afoul of the antitrust laws were agreements that were not in a collective bargaining agreement. And in Connell, for example, the agreements were aiming at people who the union wasn't even trying to organize themselves. They weren't the workers that the union was trying to affect. And I see that I've consumed my eight minutes and I don't want to intrude in Ms. Morton's time. Thank you. Very good. Thank you. I've really been on him before the argument because, boy, he stopped. Most people don't stop at the 12-minute mark. Well, I know he did go over, but that's all right. Good morning, Your Honors. My name is Eleanor Morton for the International Longshore and Warehouse Union, and it's Locals 10, 13, 8, and 19. I want to just touch on briefly the question that you asked, Judge Zips, about why isn't this case factually distinct from ICTSI? And I agree with my colleague, counsel for PMA, on his explanation, but I also want to offer one other. In ICTSI, the court's analysis did not turn on who happened to be the entity complaining about the particular restraint that was being challenged in that case. In that case, it was ICTSI who was complaining. But the entity that had previously performed the work was the Port of Portland. The Port of Portland could have come to the court and made the same claim, that the restraints that prevented them from doing the work and that required ICTSI to do the work was a restraint of trade in violation of the Sherman Act. The fact that it was ICTSI making the argument instead of the Port was not a factor in the court's analysis, nor should it have been, and that shouldn't be a factor in the court's analysis in this case. Any sort of an agreement that is alleged to be a restraint of trade is going to affect multiple different parties, and the identity of the particular party that happens to come to the court to complain about it should not determine the analysis. And that's really the argument that plaintiffs are making here in this case. Because they are like the Port of Portland in the ICTSI case, the cases are distinct, but in fact they are not. We have two cases that address the identical collective bargaining agreement and the identical provision of the identical collective bargaining agreement. There really is no daylight between the two cases here. And in fact, this case presents a stronger case for application of the exemption because we went through discovery on the non-statutory labor exemption. We moved for summary judgment on application of the non-statutory labor exemption and put in front of the court evidence about the bargaining that occurred that resulted in this provision, evidence that is in all material respects undisputed in the record. Can I ask you about the Second Circuit case that your opponent referenced? Because I read that case and it seemed to be quite on point and obviously came out in a way that's adverse to your clients here. So what is your response to that case? Are you asking with regard to the labor law piece or the antitrust claim? The antitrust claim. There is tension, to be sure, between the Connecticut Ironworkers case in the Second Circuit and the ICTSI case in this circuit. This panel should follow its own precedent and should follow the ICTSI case. But there are other distinctions between the two industries that were at issue in the two cases. In the Connecticut Ironworkers case, we were dealing with the construction industry. And in this case, we're dealing with the waterfront industry, where there is a very particular relationship, both on the West Coast and on the East Coast, between the unions that represent the workers and the employer groups. As a matter of federal labor law, for the last 80 years, the union has bargained with a multi-employer group of employers, who include carriers, maintenance and repair companies, stevedore companies, terminal operators. The National Labor Relations Board has said that that is the appropriate bargaining relationship in the waterfront industry. And this court has recognized that in other cases as well, like the American President's line case that we cite in our briefs, which adopts some of the reasoning of the Bermuda container case in the Second Circuit. In the context of this particular unique relationship, where there is multi-employer bargaining, pursuant to an order of the labor board, the entity that's charged with principal authority for regulating labor law. Bargaining in that context, when we're talking about the assignment of work to that bargaining unit, simply falls outside of what antitrust law was intended to regulate. If I may, I want to use my time left to turn to the other claims against my clients. First, with regard to the breach of contract claim, Judge Zeps, you asked counsel for the plaintiffs what allegations they would add to the complaint. What plaintiff described really only supports the argument that we have made all along, which is really what they're trying to do with this breach of contract claim, is obtain some kind of order about their general work or trade jurisdiction. The language of Article 20 of the AFL-CIO Constitution is clear. Members can use that provision to obtain rulings about work at a specific location or work site, where they have a history of historically performing that work. Here we don't have that. We have entities like Surf City and Sarans who bid on jobs at multiple different locations. They might get them. They might not. But it simply cannot be... But let me back up. So under Article 20, you can seek work regarding a specific location or work site. It's clear under Article 20, Section 20 of that article, that you cannot use that provision to obtain some sort of ruling about general work or trade jurisdiction. And that is essentially what plaintiffs are seeking here, is that any time there's work performed with cranes on the waterfront that involves rigging at any marine terminal on the West Coast, it is ironworkers' work. And Article 20, by its very terms, precludes that sort of ruling. Now, we also have the issue of the remedies that they're seeking. Now, plaintiffs say we did not raise that below. In fact, we did raise it below in our motion to dismiss the initial complaint and first amended complaint. Judge O'Connell agreed with us that plaintiffs were precluded from seeking injunctive relief under Article 20, and it appears, based on counsel's representations today, that they are, in fact, no longer seeking it.  plaintiffs also are not entitled to damages. It's simply not a remedy that's available under Article 20. Let me speak in my minutes that I have left about the labor law claim. If you look at the language of the collective bargaining agreement, what it shows is that what the parties were doing here, meaning the ILWU and PMA, was trying to preserve work for the Longshore Union in the face of technological change. And the evidentiary record prepared in the context of the non-statutory labor exemption bears that out. There's no evidence that there was some other motive. Counsel, let me ask you this as to this claim. Can the PMA subcontract crane work to any employer who does not use defendant union? PMA is a bargaining association. It's a multi-employer bargaining association. Its member companies have a relationship with the ILWU, and when they perform work that's under the contract, they have a choice in how they do it. They can do it themselves, or they can subcontract the work to an entity that is subject to the same agreement, that is part of the same multi-employer bargaining collective. Isn't that the nub of their claim, though? Isn't that what they're saying, that's the violation? That is their claim. That is their argument, that that is the violation. And why is that wrong? It is wrong because if you look at the American President's line case, the Bermuda container case, and the ILA cases from the Supreme Court, what they explain is that in this industry, when you're talking about primary versus secondary employer relationships, the primary employer is the multi-employer bargaining unit collective. So it's the membership of PMA. And the American President's line case is a very good example. In that case, the union in Alaska was pursuing a grievance against a member of the PMA, an analogous organization that exists in Alaska, to obtain certain work. And American President's line, in that case, the employer who the grievance was filed against, said, no, this is a no-subcontracting provision, this is AD, we don't do this work ourselves, you're telling us we can't subcontract it to an entity that doesn't have a collective bargaining agreement with the ILWU. They brought that case to the NLRB. The NLRB found, no, this is primary. This is the ILWU acting within its bargaining relationship, a bargaining relationship created by the NLRB. The ILWU acting within its bargaining relationship to obtain work from its employer, the collective. And this circuit, in the American President's line case, agreed with that analysis, adopting the similar analysis in the Bermuda container case from the Second Circuit. So it's simply apples and oranges when you're looking at cases in the construction industry where there is this subcontracting relationship and you don't have this multi-employer group created by the NLRB. Whereas here we do. If you go back and look at the NLRB's creation of this bargaining relationship in 1938, it's the shipping association case that we cite in our pleadings, the NLRB talked about some of the unique features of this industry that make it appropriate for the union to bargain with the employer collective as a group. So this isn't something that was created in 2008 as a result of these contract negotiations or was created as a result of any contract. It's not a creature of contract. It's a creature of federal labor policy by the NLRB that has guided this work on the waterfront for the last 80 years. Now, plaintiffs say that what we are really arguing about here is an affirmative defense. But that's just not the case. I believe it's the Boma case that they cite is not only a case from the NLRB, it's a case from an ALJ in the NLRB. So we have no precedent, certainly from this court, let alone from the NLRB, saying that in the context of a federal case like this one where we have pleading standards under Twombly and Iqbal that a plaintiff can pass muster without alleging secondary conduct. And the law is clear under the National Woodworkers case, the ILA cases, and others, that only secondary conduct violates 8B4, which is a necessary predicate to a claim under Section 303. And with that, I am out of time. Thank you. One quick question for you. Please. So this agreement, it's no longer in effect, I assume, the one that you all are fighting over? It is. Okay, because it seemed like it was going to end in 2014. It was renegotiated, and there's now a successor agreement in place. Basically the same essential term. Those provisions were either entirely unchanged or at least materially unchanged. Okay, great. Thank you very much. We will hear you in rebuttal. Sir, I apologize. I cut you off because I thought you said the two of you were going to split your time 10 to 10. That's the only reason I stopped you when I did. No problem. So you have plenty of time left for rebuttal. First of all, Your Honor, the reference to PMA companies competing is set forth on page 18 of our reply brief. So obviously these companies compete because they're the ones now doing the work, and that was the whole purpose of the PCLCD, was to grab this work and give it to the ILW contractors, who happen to be members of the PMA. But neither counsel for the defendants has addressed the issue of the antitrust violations on their face, so I'm not going to spend time on that. I'll go directly to the NSLEA, non-statutory labor exemption, and the MACI test. The first question is, is this whether a primary effect? So the question is, does the restrictive agreement result in, for example, wages, that because they're higher result in higher prices? That would be the primary effect would be the wages, the indirect effect or secondary would be the higher prices. However, if the union and the contractor enter into an agreement as to the prices of the product, then that's a direct effect upon the product market, and that's what you have here. There's no indirect effect here. The contract specifically says, as illuminated through the arbitration decisions, that this is subcontracting. You cannot subcontract to non-ILW contractors. That's not indirect. That is very direct. And that's what the Phoenix court said, because they keep ignoring what the Phoenix court actually says, and the court said there that, first, this agreement only affects the parties. It does not bar any union or non-union subcontractors from competing with the signatory subcontractors for construction jobs. But that's exactly what this agreement does. It says you can't compete. It doesn't say you can compete, but you may have to face higher prices, or lower prices from your competition. It says you can't compete. So if you have a contractor who's not signatory to the ILW, but can do a better job, better quality, at a lower price, and provide better customer service, this agreement prevents them from competing for the work. And that's why it not only violates the antitrust laws, but it also fails to satisfy the first requirement of MACI that it does not primarily affect somebody other than the parties to the agreement. The second part, Connecticut Ironworkers, is directly on point, in that the court said this involves subcontracting, not work assignment, despite the semantic game that they want to play here. It is clearly subcontracting. And the issue there is subcontracting is not, it's very clear it is not a mandatory subject of collective bargaining unless it's done for purposes of work preservation. And the evidence in this case is that it was not done for purposes of work preservation. I mean, even the district court said there's no evidence to support a claim of work preservation. And that's with respect to non-statutory labor exemption on the antitrust claim. Turning to the labor law claim for a moment, here we're dealing just with allegations. That was a motion to dismiss, not summary judgment. So what they want to do is try to produce all this so-called evidence to support a motion to dismiss, which they obviously cannot do. They're bound by the allegations of the complaint. We've explained why this is work acquisition and not work preservation. And so whether it's an affirmative defense or not, in which we believe that it is, we've clearly alleged that there's a secondary purpose. Moving back to the antitrust claim, is there evidence that this was mandatory? No. Subcontracting only for work preservation. And then if you move on to good faith, they say, well, we relied upon this affidavit. Well, that's not an undisputed fact. Please come out differently on that issue when we, in our previous case, we said that that element was satisfied. That's the exact same agreement. We're not in a position now to say that it wasn't negotiated in good faith. Oh, well, you have to address what the arguments were. They didn't challenge it in that case. Because of the nature of the claim, they didn't challenge it in ICTSI. Well, I thought that we certainly made a determination. Oh, you made a determination, just like they made a determination in Phoenix. But it really wasn't contested. But what you have here is that, keep in mind, that ICTSI did not involve subcontracting. It only involved work assignment. Okay. And so you can have an agreement that's lawfully enforced in some cases but not others. And what you have in this case is that the effort to subcontract or to limit subcontracting was not negotiated in good faith. For one reason, PMA said... But they didn't agree to it. It wasn't even part of the agreement. Well, but that's what I'm saying. So I don't know how you can argue that they somehow colluded. The PMA is saying, we never agreed to this, and it was forced on our throat. We don't have to. It's an affirmative defense. They have to prove that it was done in good faith. We don't have to prove it wasn't. They have to show that they negotiated in good faith. So how are they going to show that they negotiated this provision with PMA when PMA says, we never agreed to that? And secondly, you have the PMA maintenance companies, who are, of course, part of PMA, who were standing to gain a lot of work from this restrictive agreement. So what you have is that one part of PMA is saying, yes, please do it. Please do it. Restrict this work. Give us a monopoly on this work. And the union is doing the same thing. So who knows what they did? Who knows what agreements the PMA maintenance companies and the union reached in an effort to get the rest of the PMA to go along with it so that they would now have not just an opportunity to compete for the work, but they would have a monopoly on the work, regardless of their abilities, regardless of how well they could compete in the open market. What's your response to their argument that, really, your complaint is just with the nature of this multi-employer group, that maybe you don't think the NLRB should have approved that, given the nature of the question? They keep saying that, but the NLRB has never approved the PMA. They don't do that. The NLRB approves the labor side, the bargaining units. But the matter of the PMA is a matter of consent. You know, the members of the PMA can take in new members if they accept them, but the union also has to accept them. If you look at ICTSI, one of the allegations in that case was that PMA, at the insistence of the ILWU, was threatening to kick ICTSI out of PMA if they didn't go along with the program. They couldn't do that if this were somehow an NLRB-approved organization. They couldn't at all. This is just a matter of consent. It changes. The testimony is it's about 75 to 80 members. Any given year, three or five members come in, three or five members come out. This has nothing to do with the NLRB in terms of how the organization is constructed. It just doesn't. And the fact is is that you can have this agreement that is properly enforced as a subcontracting where it would be properly enforced as the actual work assignment. Okay, your time is up. Thank you very much. The case to start will be submitted, and we are adjourned. Thank you.
judges: Watford, Owens, Zipps